May it please the Court, my name is Irene Keyes Walker and I represent Janssen Pharmaceutica and Alza, who are the manufacturers of the derogesic patch, a powerful opiate used for the relief of chronic, excruciating pain that cannot be relieved by any other means. There are three main issues in this case. The first is the sufficiency of the evidence of defect to support the jury's $18 million verdict in this case. The second are evidentiary errors primarily on the element of causation. And third is the improper and inflammatory closing argument in this case. Going to the first error, the sufficiency of defect, this is a case where the doctrine or called the malfunction doctrine or the Tweedy doctrine in Illinois asks for an inference of defect. That inference requires evidence of a malfunction and evidence eliminating other causes of the malfunction. Now, where the legal error most often occurs in this doctrine is saying that, well, it's a malfunction in eliminating other causes of the injury or in this case other causes of the death. But the proper analysis is to say it's a defect, not causation, which means what is the malfunction evidence and what is the evidence eliminating other causes of the malfunction, as this court explained in the Erzrumbly case. That's the way it's supposed to be analyzed. Because when you don't and you start saying evidence of causation is enough to prove defect, you're then conflating those two elements, the defect and causation, and you're doing exactly what product liability law says you cannot do, and that is infer a defect from the accident, death, injury alone. In this case, how that is done is with a number, a post-mortem number of a level of fentanyl that's affected by many different things. And the effort is to say because of that number, we can infer a defect. But what about how does this apply to this case? What about the sticky spot, the slick spot that was found on the back of the decedent? Those are offered, there are other two elements, and I would say those are what they offered to try to show defect as opposed to simply cause of death. One was the so-called slick film that was remembered by the plaintiff two years after he said he had never seen anybody, any patch leak, and had never reported any slick film to any emergency personnel or anything else. For that, we refer this court to Illinois authority and especially Gillen v. Collegecraft, which says that when an expert relies on his opinion that contradicts the plaintiff's own testimony, it is speculative and insufficient to support an opinion. The opinion of that the slick film was a gel in this case came from an expert who said that he assumed that because it was an unusual occurrence. And it was not an unusual occurrence that there was this slick film because the undeniable and the undisputed evidence was that Ms. DeCosilo had adhesion problems, she sweated under her patch, she had a large patch on top of that, and the film plaintiff described as if the testimony was that gel is not slick. It is a viscous honey consistency. Well, it also could be combined with perspiration. The point is, isn't the expert entitled to make that opinion? And then isn't the jury entitled to take that evidence and believe that opinion for evidence of the defect? We're not asking, you're not asking us, and I know you're not so naive as to ask us to substitute our judgment for that of a jury. The question is whether under a judgment NOV standard there is sufficient evidence for us to reject the jury's verdict and tell the jury that there is no basis, acceptable basis for them to have rendered that verdict, which is a much different and much higher burden. And I do understand that, Your Honor, and I accept that. Now, I will say there was no indication that it could have been sweat mixed with gel. All we know is that we had an expert who said, gee, it had to have been gel because this was an unusual occurrence, and that puts it exactly in the same category of Gillen that says, look, when a plaintiff says, I didn't notice anything unusual about the odors or the fumes in this case, and then an expert comes along and says, yes, but it must have been paired as driving because it would have been in the car. It is the same thing. Can you take an expert and take an everyday occurrence that is nothing unusual that the plaintiff wipes off with his bare hand, that he doesn't know if it's sweat or not, and convert it merely by presenting expert testimony? He interpreted it more than converted it, didn't he? He interpreted two words, slick foam, and he interpreted it to mean something totally different. But I understand where you're coming from on that, and that's the Gillen is the case that we would urge this Court to apply to that to see if there was actual expert testimony of that. And then the only other expert test or testimony was the recall, which, of course, affected only 1 percent of the product, and was for a leak that, quite frankly, for opiate tolerant patients like Ms. DiCosolo was likely to produce non-therapeutic effects. In other words, they wouldn't get as much gel. Well, I mean, it's hard to put on blinders and suggest that when the defect that caused the recall from that lot, albeit only a defect found in 1 percent of the lot, was exactly the type of defect that would have, if it existed in that particular patch, caused exactly the type of injury that this person died of. It's hard to ignore that, isn't it? It is, which is precisely why, Your Honor, courts are so very careful not to allow evidence of recall. Remember, in this case, there was actually an initial diagnosis, or not diagnosis, finding by the coroner that the manner of death was suicidal. But isn't that because they couldn't possibly come up with a reason why somebody would take that much accidentally? That was because, Your Honor, he looked at the patch he was wearing, and he didn't see anything wrong with it. But there's absolutely no question that that was not the only patch that was used by this decedent. Of course not. He looked at the last patch, which was the only one that was preserved for his observation. But when he was told about the recall, he then said, oh, I changed my mind because the last patch seemed defective. So he had, even though he saw nothing wrong with it, powerful recall evidence is such that he thought the last patch was defective. And let's talk about this causation issue of what you have in these, all of these elements of causation, and what kind of evidence should the court have allowed in for proof of causation, since cause of death has become now the conflated case. You have how much fentanyl was in her blood post-mortem. And that we know, or how much fentanyl is a fatal amount or the cause of death. And we know, we had evidence that anywhere, depending on the individual, from 3.5 to 55 have been reported by various coroners. So we know that that's number all over the place. And it overlaps with patients walking around with 4, 6, 7, 8 levels that are not overdosed. You have, well, what was it before she died? You have all the PMR, you have the delay in the testing of the blood, all of these things in the autopsy that can affect that. You have, well, what else was she taking and how much did she take of it? And in that you have an incomplete list given, so there was an incomplete testing, and you have the pills destroyed by the plaintiffs. But wasn't there also not even full testing of everything that was disclosed? Yes, that as well. So we have the assumption that's implicit in your argument that if they had listed it, they would have tested for it. When we know that there were drugs that were listed that weren't tested for it. All the more reason, Your Honor, that if causation is going to become the linchpin for a defect case in an $18 million verdict, shouldn't the other side have a little bit of leeway in describing what kind of evidence should go to the jury on causation? Consider clonazepam alone. Clonazepam is the one that was not listed on the list, that she received a prescription for just three days before, that was discontinued from her doctor and that she was prohibited from taking because she was on too many hypnotic sedatives. And what evidence was there to support evidence of clonazepam coming in? Well, as the trial court said in its own opinion at pages six and seven, plaintiff's own sworn interrogatory. Plaintiff said in his interrogatory she was taking clonazepam at the time. So that alone should be enough evidence to let the jury hear that she was taking clonazepam at the time. Then you also have the fact that she obtained this prescription just three days before, that she was in escalating pain, that she was entering the hallucination period, and yet the court entered this broad in limine order that said at the outset, unless it was tested for and on board, you cannot even mention it to defense. And because of that, the jury was deprived of key evidence of a CNS depressant. Not only were they deprived of that evidence, but the plaintiffs used it to their advantage to undermine the credibility of vows of witnesses. We had Dr. Kearney on the stand to testify that this death was caused by the interaction of multiple CNS depressants. And plaintiff's lawyer got up and said, well, you would have to say if she was taking five drugs for three months and nothing changed in that and she up and dies, then you have to, something had to have changed, correct? Correct. But what can you say? Because he's not allowed to say, but there is evidence, including plaintiff's own sworn interrogatory, that she was taking clonazepam and that was a change in her regimen. I see I have used up my main time. I'd like to reserve my time for a moment. Yes, thank you. Good morning and please report. Good morning. Starting with the issue of nonspecific defect. I'm sorry, I didn't get your name. I'm sorry, Eric Pearson for the appellate. Appellants and appellee are in agreement on the elements necessary to prove a nonspecific defect, that is, showing through circumstantial evidence that a product failed to perform as reasonably expected, showing that there was no abnormal use or misuse, and negating other reasonable secondary causes of the malfunction. We agree with that. Here we did all of those things. Number one, we showed that this patch failed to perform as expected by giving Janice Nicosolo a fentanyl level of 28.2 nanograms when the patch was intended to give her a level of 1.7 nanograms. The Kuhneman case from the Northern District of Illinois against these same defendants holds that that is enough to get to a jury on a nonspecific defect theory. We got to the jury. We proved that. Even defendant's own expert, Ross Zumwalt, was asked if a patient has a post-mortem fentanyl level of 30 nanograms, very close to Janice's 28.2, what would your thoughts be if they were using a 75-microgram patch? He said, my answer is I would think that maybe the patch had too much drug put into it in the beginning or something, and there was something wrong with the patch. That's their own expert at Supplemental Record, Volume 6, page 1433. Contrary to what the appellants intimated, we did not rely just on a number. Now, first of all, by calling it a number, that is sort of a pejorative term that undermines the importance of this figure. We had testimony from our experts and their experts that medical examiners around the United States rely on post-mortem fentanyl levels in determining cause of death. Their own expert, Dr. Zumwalt, we cross-examined him with numerous autopsies from his own medical examiner's office in New Mexico, showing that they routinely rely on post-mortem fentanyl levels, and that they characterize fentanyl levels much lower than Genesis 28.2 as lethal or fatal. But we didn't just rely on a number. Our expert, Dr. Krausness, one of the leading experts on transdermal technology in the world, explained how it is a leaking patch could cause the high level. We didn't just say high level, end of story. He explained that if a patch leaks, the rate control membrane is no longer effective, the area of skin delivery has increased, and evaporation can drive fentanyl into the skin faster. So we had the level, we had an explanation as to how the leak could cause the level. Secondly, we had uncontroverted evidence that the level of fentanyl in her system was a fatal level. The evidence was that fatal levels begin at 3 nanograms. The average was 8.3. Sure, to some people it takes more, but her level is 28.2. The average fatal level is 8.3. There is also the concept of the post-mortem concentration, correct? Absolutely. Post-mortem redistribution was an issue. It was an important issue. We cited numerous cases from around the country saying it goes to the weight, not the admissibility. It's an evidence for the jury. They had an expert, we had an expert. Now, importantly, Dr. Kogan, the Cook County medical examiner, testified that the 28.2 level was a quote, accurate assessment of her blood level at the time of death. We had Dr. Downs, our forensic pathologist, testifying that PMR did not significantly affect the level. We had Dr. Middleburg, our forensic toxicologist. And again, we had Dr. Zumwalt, their own expert, testifying that he routinely relies on post-mortem fentanyl levels. We had autopsies from his own office saying, this person died of fentanyl intoxication or fentanyl overdose. He had no trouble relying on a post-mortem level when he was doing his job as a medical examiner. So PMR was a fact issue for the jury. One thing I do want to point out, which is interesting, in their reply brief, the defendants pointed out that, well, there's a study that showed that somebody had a 9.9 fentanyl level in a living patient. I don't know what they were trying to prove with it, but that person was wearing three 100-microgram patches. That person had 300 micrograms of fentanyl, four times the 75-microgram patch that Janice DiCosto had on, and yet their level was only 9.9, not 28.2. If anything, that data point supports our opinion. At the end of the day, our experts said PMR did not substantially affect the level. Dr. Middleburg cited a study by Anderson and Muto showing, at most, PMR can have a doubling effect, which cuts her level down to 14, still eight times higher than it should have been. So PMR was a fact issue for the jury. Would you like to address the evidentiary issue counsel referred to? Related to the clonazepam and causation? Absolutely, Your Honor. First, I want to point out something, and maybe it's not technically equally relevant, but throughout the brief they sort of insinuate that the medical examiner chose not to test for certain drugs that were listed on this first call sheet. Now keep in mind, this is something that Mr. DiCosto writes down the day his wife just died, and to attack him for maybe forgetting something, it is absurd. Secondly, Mr. Cushon, the plaintiff's lawyer, sent a letter to the medical examiner's office in July 2004 listing all the drugs, and he added and included clonazepam and Avenza, and yet the doctor didn't test for those, and he was cross-examined on that point by defense counsel at trial. Thirdly, and this is important, the defendant here is a large pharmaceutical company. They have all the resources in the world to test blood. They argued at trial, in Volume 5, page 1067, that NMS, the testing lab, still had blood at that point in time in July 2004 and could have done testing. They never tested for it. The defendants never tested for it. They didn't want to know whether she had taken clonazepam. They wanted to make the inference. But the most important reason that Judge Flanagan didn't have used his discretion was the defendants stipulated that they had no evidence that she had clonazepam in her blood. It was a clear, unequivocal stipulation made by counsel in Supplemental Record, Volume 6, page 1311. It was relied upon by my partner in terminating his cross-examination of Dr. Kearney on that exact point. He was about to cross-examine him and impeach him with a deposition in which he said that he had no information that she had clonazepam in her blood, and counsel cut him off and said, we'll stipulate we have no evidence she had clonazepam in her blood. That is a binding stipulation that we relied upon. A stipulation that there's no evidence doesn't mean that it's excluded as a possibility under their theory. The question is a legal question about whether the judge abused his discretion in not allowing the fact that it wasn't tested for and was accessible, arguably, to her at the time of her, preceding her death as suggesting to the jury that that's an alternative cause of death. And I think that to the degree you're suggesting that they're arguing something different or that that stipulation somehow waives that argument, I think you're reaching. Okay. Thank you, Al. I would point out that that stipulation came after the following testimony had come out. Their expert said, well, the reason I think she took her clonazepam was because she had access to it, to which Judge Flanagan readily replied, oh, boy. He realized that's all they had was access. It came after their expert was asked if adding clonazepam back into her drug med regimen in February would have been a significant change to what she had been on. He said, quote, I'm not sure. It came after he was asked that and he said, well, it could contribute to the respiratory depression. Their expert hadn't carried the ball on this issue of clonazepam, and counsel realized that when she made the stipulation. Mere access is not evidence that someone took a drug. The case law doesn't stand for that. Secondly, their experts didn't carry the ball on causation. None of them testified that adding clonazepam would have changed the outcome of this case. In fact, their own experts agreed to that. Adding clonazepam wouldn't change anything. So, Your Honor, there was no causation. Pure speculation to assume that she took the drug. And we never argued that her drug regimen hadn't changed. If you look at the actual sites for the record, we commented on the record of the evidence that had been admitted and properly make references to that. Last thing I want to touch on, closing argument. To preserve a point of error, an objection must be made at trial. There was no objection during the 50-minute closing argument, the opening portion of closing argument, by my partner. No objection. Not a single objection. Even when that opening portion of closing argument was finished, counsel didn't object. She didn't move to strike the statements. She didn't ask the court to tell the jury to disregard the evidence. She didn't ask the judge to remind the jury that closing arguments are not evidence. She didn't ask the judge to remind the jury that punitive damages weren't available. She seemed more interested in setting up an appellate point than remedying whatever prejudice she felt may have happened. Even when she made her objection, it was too general to preserve error. Her argument was simply that punitive damage case, end quote. That it's too general to preserve error. Third, it was not made timely. In the Chau case we cited in our brief, the court held that a delay of one and a half to two minutes amounted to a waiver. Here, we had a 50-minute closing argument where not a single objection was made. Second, the comments were invited by statements made by defense during their opening statement. They wrapped themselves in the flag of the FDA. They argued that the vision system was timely implemented. They argued that they acted appropriately in how they handled the recall. The closing argument attacked each of those points by saying, let's look at what the defendant's true motivation was. It was to make money. The financial documents we relied upon to make that argument were admitted without objection. And we were arguing what their motive was. The LaPlante case that we cited says that's relevant. So, these were key issues in the case. The delay of the recall. They admitted a handful of complaints should have triggered a recall. They waited until 21 complaints. They announced the recall the day after Janice DePilso died. Why is that relevant to the issues of causation, though? It's not. And weren't you really using the thin end of the wedge to try to get in something that really wasn't for the jury's consideration in determining the issues that were properly before it? If you had a punitive damage case, those would be highly relevant. But you didn't. No, not at all, Your Honor. Number one, the Millett case rejects this notion that you have to independently prove the defect before a recall is admissible. The court never accepted that argument. The cases we cited say... But why do we care whether they had one complaint, no complaints, or 21 complaints before the recall? Why does the jury properly care in the context of this case? Because we didn't have just a strict liability claim. We had a negligence claim. We argued they should have warned the public sooner. Keep in mind, a recall isn't just give us the product back. The recall is a warning. This is a letter that went out to physicians. It went out to the newspapers saying, we're warning you. This product can leak. It has leaked. Send them back. We had a negligence claim. Had they adhered to their own internal standards of a handful of complaints triggering a recall, this product would have been recalled before Janice DeCosalo died. Instead, it was recalled the day after she died. Her exact past was recalled. So it went to our negligence claim. This wasn't just a product's liability claim, Your Honor. So we think it was incredibly relevant, not only to show the defect, but it went to the heart of our negligence claim that the recall, it waited too long to recall it. It waited too long to implement the vision system. And those were the things that were commented on in closing argument. I believe my time is over, unless the justices have any more questions. Thank you very much. Thank you, Your Honor. A couple of points. One is the argument that adding clonazepam wouldn't have changed anything. That's particularly ironic, because our experts were able to give an opinion of a polypharmacy synergistic effect, cause of death, under this extremely over-reliant  drug. It allowed them only to testify about drugs that were in excess of the prescribed limits, other than fentanyl, in the six tests that were done. Would you address the point about the failure to ask for the samples to be tested? Your Honor, I heard him say that, and I heard him have a really argue that. I remember reading that in the transcript, and it was extremely confusing. I'm still not sure what that transcript says. What I do know is that it is plaintiff's burden to prove causation, not the defendant's. We had a situation here where it wasn't until the first day of trial when the court told us, oh, by the way, you're not going to be able to present any evidence of any drug that wasn't tested for and found to be on board. The discovery had been on all of these drugs, our experts had been prepped that this is how they were going to testify. We couldn't even talk about Avenza having a short half-life. But surely in the discovery process, if there was concern on the defense part that the clonazepam was in the persistent, there were ample opportunities to have either tested it yourself, ask that it be tested by the plaintiff, and to foreclose once and for all that you were completely right or you were completely wrong. And now after the 11th hour, to have a complaint that this might have been in the system, which is the best you can say on this record, really is not the strongest position to approach this from. Your Honor, I understand. Wouldn't you agree to that? If we had known way back when that the judge was going to kind of make the kind of rule. Regardless of the judge's decision. But it makes such a difference. Wouldn't you want to know if some of your experts would have thought that the clonazepam could have been a factor in this? Wouldn't the responsible thing to do be to say, well, let's test and find out. Now, if the plaintiff's position was it wasn't in the system and they did, albeit in the second disclosure, say it's there, is it their burden to have tested for it? And even if you think that they should have tested for it, in the absence of a test by the plaintiff, shouldn't the defense have asked for it? Well, Your Honor, what I know they can't do is get rulings that excludes all of this. You keep going back to the rulings, don't you? And that's because, Your Honor, you know how cases evolve. Yeah, I do. That's why I'm asking the question. Someone coming in at trial and taking advantage of this ruling to say her drug regimen didn't change. So suddenly he has taken a burden of his to prove causation and turned it into a sword by misrepresenting. And you look at Petrakis. Very Petrakis versus Thedos. Very similar case. All sorts of arguments about whether her blood alcohol test should have come in, and the judge said no, it shouldn't have come in, and it's not reliable enough, and who tested it, and who did this, that, and what. And then the plaintiff used it to say, why should she have turned in front of emergency room vehicle and opened the door, and the judge said, well, we're still not going to let that evidence in. Here they said, well, nothing in her drug regimen changed. And look how critical it was at pages 30 to 34 of our brief, over and over again. If you're taking five drugs for three months and nothing changes, then something must happen for this death to occur. What? It must have been a leak. My God. Something changed. He said she was taking clonazepam. So we know that something changed, and that's where it becomes critical in this case. We know that something's changed because this level of fentanyl was greatly higher than any reasonable circumstances should have allowed, right? It was greatly higher, but why? We don't know what this individual was before. We don't know what level it was. We don't know how permeable her skin was. We understood. But what you get when that happens, you get a case like this. $18 million verdict is what you get. You get a criminal case where it's 5.8, and they have the patch, and they look at it, and there are no defects. And they say, well, we don't care. 5.8, that can be lethal. That's enough to go to the jury. So it gets back to whether the malfunction doctrine is something that's properly applied here, and if it is, what is going to be, how can defendants rebut it? And what can plaintiffs do to keep defendants from rebutting causation? Which in this case, all we were allowed to do was say, based on what was on board on an incomplete test and destroyed pills, this is what it is. I realize I've gone over. I will say one more thing about closing argument. Understand that this judge said this was not an improper argument. So when you talk about objections, it would have been futile to raise them earlier. You did raise it at the end of his argument. There was no, you know, you're right, I'll give the jury a curative instruction. There was improper. It was like nothing wrong with it. You're saying that because after the fact, the judge said there was nothing wrong with it, it absolves you from the responsibility of making a timely objection during the argument? I hope you're not saying that. And we know that legally, when the argument is so extreme that justice is impacted, you don't even need an objection. What I'm saying is that we had a situation here where we had the kind of argument that was plain error. It was so inflammatory, alleging the company, go back and tell this company who killed Janice DeCosla, killed our mother and the mother of my children. And they need to take responsibility. When a judge says that that doesn't even cross the line of propriety, then you know you have a situation where it's egregious. It's egregious. We had a one-sided trial. We didn't get a fair trial. And we respectfully ask for an amendment. Thank you.